[No. 26495.   Department Two.   May 11, 1937.]

DOROTHY GRANT, *as Administratrix, Respondent,* v.
FISHER FLOURING MILLS COMPANY, *Appellant.*[1]

[1]Reported in 68 P. (2d) 210.

*Ralph S. Pierce, Edwin J. Cummins, Gordon H. Sweany,* and *Venables, Graham & Howe,* for appellant.

*Sam L. Levinson, Wm. Phelps Totten,* and *Eimon L. Wienir,* for respondent.

ROBINSON, J.—This is an action brought by the administratrix of the estate of Thomas Grant, deceased, to recover damages from Fisher Flouring Mills for injuries alleged to have been suffered by Grant while in its employ.

The complaint is based upon § 2, chapter 84, p. 165, Laws of 1905, commonly known as the "factory act." Section 2 of the act (Rem. Rev. Stat., § 7659 [P. C. § 3518]), is as follows:

"Every factory, mill or workshop where machinery is used and manual labor is exercised by the way of trade for the purposes of gain within an inclosed room (private houses in which the employees live, excepted) shall be provided in each workroom thereof with good and sufficient ventilation and kept in a cleanly and sanitary state, and shall be so ventilated as to render harmless, so far as practicable, all gases, vapors, dust or other impurities, generated in the course of the manufacturing or laboring process carried on therein; and if in any factory, mill or workshop, any process is carried on in any inclosed room thereof, by which dust is generated and inhaled to an injurious extent by the persons employed therein, conveyors, receptacles or exhaust fans, or other mechanical means, shall be provided and maintained for the purpose of carrying off or receiving and collecting such dust."

Failure to comply with any provision of the factory act constitutes a misdemeanor punishable by fine.

It is alleged, in substance, that the company oper-

ated a flour mill; that from June, 1926, to July, 1930, Grant was engaged in working in and about certain enclosed rooms of the mill in which bleaching processes were carried on using nitrogen peroxide and chlorine gas; that the company, with knowledge of their noxious character, failed to warn Grant of the dangers thereof and neglected to provide the rooms with good and sufficient ventilation and to so ventilate the same as to render harmless, so far as practicable, such dangerous gases and impurities generated in the course of the bleaching process, with the result that Grant received a serious injury to the tissues of his throat and lungs, from which he suffered severe pain and was totally disabled for a period of about three years before his death.

The defendant denied all allegations of negligence and that the plaintiff was damaged by any of the matters and things alleged in the sum claimed or in any sum whatsoever. It pleaded a number of affirmative defenses and, among them, that, if Grant had been exposed to bleaching agencies or gases, such exposure was due to latent defects in the bleaching machinery not discovered by the defendants "nor by the regular inspection of the said bleaching machinery."

A trial lasting three weeks resulted in a verdict for the defendant. The plaintiff timely moved for a new trial, which was granted. The order is, in part, as follows:

"Now, THEREFORE, IT IS HEREBY ORDERED that plaintiff's motion for an order granting a new trial herein be, and the same is hereby granted, solely on the ground and for the reason that said defendant's Exhibit No. 41-A was erroneously admitted in evidence.

"IT IS FURTHER ORDERED that in all other respects plaintiff's motion be, and the same is hereby overruled and denied."

The order was entered on July 8, 1936. On July 21st, the defendant appealed from that portion of the order granting a new trial.

The condition of the record is such that we are called upon to determine the scope of the appeal. On October 1, 1936, appellant filed and served a proposed statement of facts. No amendments were proposed, and it became, in due course, an "agreed" statement within the language of Rem. Rev. Stat., § 389 [P. C. § 7817], and was duly certified by the trial judge as containing

". . . all material facts, matters and proceedings heretofore occurring in said cause, and not already made a part of the record therein."

On December 1, 1936, the appellant served and filed its abstracts and briefs. These, with the transcript and statement of facts, were filed in this court on December 8th, and the case was later set to be heard on February 9, 1937. The respondent did not serve a brief until February 4th, and then only in manuscript form, followed by printed copies on February 6th. In this brief, the respondents, citing the case of *Rochester v. Seattle, R. & S. R. Co.,* 75 Wash. 559, 135 Pac. 209, asserted the right to urge on appeal all errors at law which it relied on, or could have relied on, in support of its motion for a new trial, and assigned eight errors with respect to instructions given and four with respect to refusal to give requested instructions.

Appellant contended in oral argument and in its reply brief that these matters should not be considered because raised only five days before the hearing. Appellant, at its own request, was permitted to file an additional brief. In this brief, the appellant still urgently contends that these matters should not be heard because not timely raised.

There is a stronger and more compelling rea-

son why we should not, or rather cannot, consider these twelve assignments. The record contains no exceptions taken by respondent with reference to instructions given or refused, or, at least, none that we can consider.

■ We have not overlooked a filing made in this court called "Respondent's Supplemental Statement of Facts" and purporting to be certified by the trial court on January 26, 1937. The certificate reads, in part, as follows:

"I . . . do hereby certify that the matters and proceedings contained in the foregoing supplemental statement of facts are matters and proceedings occurring in said cause, and the same are hereby made a part of the record herein; and I do further certify that the said supplemental statement of facts contains all the material facts, matters and proceedings heretofore occurring in said cause and not already made a part of the record herein."

This supplemental statement seems to have been first filed in the lower court on the day it was certified, more than six months after the time for appeal began to run. There is attached to it an uncertified instrument bearing the January 26, 1937, file mark of the clerk of that court, which indicates that, on January 21, 1937, the respondent gave the appellant a copy of the proposed supplemental statement and notified it that respondent would apply to the trial court for its certification on January 26th.

Assuming that the file marks are correct, and we have no reason to think otherwise, we can take no notice of the contents of this so-called supplemental statement. It will be observed that we are not dealing with a corrected certificate, but with a supplemental statement proposing additional matter, for the certificate of the court, speaking as of January 26, 1937, says that its contents "are *hereby* made a part of

the record herein," and that it contains "matters and proceedings heretofore occurring in said cause *and not already made a part of the record herein.*" (Italics ours.)

The trial court had no jurisdiction whatever to settle and certify a supplemental statement of facts proposed more than ninety days after the time for appeal began to run, and this court has no jurisdiction to consider a statement so proposed. *State v. Schafer,* 154 Wash. 322, 282 Pac. 55; *State v. Sherwood,* 166 Wash. 160, 6 P. (2d) 595; *Tremblay v. Nichols,* 187 Wash. 109, 59 P. (2d) 1123. In the case last cited, the supplementary matter was stricken although no statement had as yet been certified at the time it was proposed. In the case at bar, the supplementary matter was proposed more than three months after a statement of facts, containing 1280 pages, had been agreed to by the parties and certified as containing all matters and proceedings occurring at the trial, and nearly two months after the appellant had, in reliance upon its finality, abstracted the statement and written and filed its briefs on appeal.

Exhibit 41-A consists of three inspectors' reports, dated March 3, 1928, February 21, 1929, and December 31, 1930, certified by the state department of labor and industries as true and correct copies of the records of that department. We quote the 1928 report: °

"INSPECTOR'S REPORT

State | Department of
of | Labor and
Washington | Industries
Branch: Seattle. | Date: 3/19/28.

Firm: Fishers Flouring Mills Company.
Address: Harbor Island, Seattle, Washington.
Operations: Flour Mill. Firm No. 3233.
Official Interviewed: B. D. Cook.
No. Employees: Male\_\_\_\_\_ Female\_\_\_\_\_ Minors\_\_\_\_\_

Power used: Steam & Elect. Stairways, Exits: O. K.
Fire Escapes: O. K.
Light: Good. Ventilation: Good. Toilets. Yes. Rest
Rooms: Yes.
Are Safety Devices and Safe Place Standards Complied With? No.
See Order.
Previous Work Order Complied With? Yes.
Safety Committee? Yes. Are Meetings Held? ...............
Minutes Kept? ..........
Safety Inspector? Yes. Plant Inspected Regularly?
Yes.
Examined Records of Inspection: Yes.
Are Educational Standards Complied With? Yes.

Inspector: H. A. Hart.

WORK ORDER

1. Guard Belt pulley drive to 3rd floor motor feed.
2. Guard belt pulley to 3rd floor barley roll.
3. Place guard to pulley to bran duster on 3rd floor.
4. Guard belt on pulley drive to flour blender 3rd floor.

Service Accepted                      B. D. Cook.

Failure to Comply with this order within 30 days subjects employer to a penalty.

When this Order is completed sign and mail to Department of Labor and Industries

Olympia, Washington.

I hereby certify that above order has been complied with.

(Signed)    B. D. COOK."

The 1929 and 1930 reports are substantially the same, except the work orders, that is, the work required to be done to make the plant conform to the factory act, are different; also, the 1929 report is made by Inspector Taylor, the 1930 report by Inspector Nash, who, instead of recording "ventilation good," as the other two inspectors did, says "ventilation o. k."

These three inspectors' reports are unquestionably logically relevant. They directly tend to disprove the allegation that the appellant failed to provide good and sufficient ventilation and, in so doing,

violated the factory act. They are relevant for another and distinct reason, for by what they fail to say they lay the foundation for a logical inference that the appellant did not violate the factory act in the manner alleged.

The fact that three different inspectors, whose legal duty it was to see that the mill complied with the factory act, inspected the mill in 1928, 1929 and 1930 and ordered only the following work to be done: Guard four specified pulleys (Hart's 1928 report); guard belt wheels on 7th floor and belt wheel on 3rd floor (Taylor's 1929 report); and guard elevator gears on 6th floor, install hand rail on 7th floor No. 1 and guard gears on mixer on 1-A floor (Nash's 1930 report),—raises a logical inference that the mill complied with the factory act in all other respects.

To say, however, that the reports are relevant does not dispose of the question; whether or not they were admissible is, due to the technical rules governing admissibility, quite another question.

The factory act provides that, when any mill or factory has been found, upon due examination, to conform to its requirements, the commissioner of labor shall issue a certificate to that effect, and that such certificate shall be *prima facie* evidence of compliance with the act. (Rem. Rev. Stat., § 7664 [P. C. § 3523].) Defendant's Exhibit 41-A was offered on the ground that it was such a certificate. After much argument, the trial court admitted the exhibit and almost immediately withdrew it upon a vigorous claim by the respondent that the reports comprising the exhibit were not the certificates contemplated by the act. When they were again offered, the trial court admitted them as "records of the department," being at the time, as it says in its memorandum granting a new trial, of the opinion "that § 1257, Rem. Rev. Stat., applied."

It is clear that the three inspectors' reports consti-

tuting Exhibit 41-A are not the certificates which are declared to be *prima facie* evidence of compliance with the act. Just what they are and their relation to this matter, are clearly indicated by the following excerpt from the act:

"It shall be the duty of the commissioner of labor, by himself or his duly appointed deputy, to examine as soon as may be after the passage of this act, and thereafter annually and from time to time, all factories, mills, workshops, storehouses, warerooms, stores and buildings and the machinery and appliances therein contained to which the provisions of this chapter are applicable for the purpose of determining whether they do conform to such provisions, and of granting or refusing certificates of approval, whether requested to do so or not." (Rem. Rev. Stat., § 7661 [P. C. § 3520].)

"If, in the judgment of said commissioner of labor, such factory, mill or workshop, or the machinery and appliances therein contained . . . does not conform to the requirements of this act, he shall forthwith, personally or by mail, serve on the person, firm, corporation or association operating or using such machinery or appliances, or occupying such premises, a written statement of the requirements of said commissioner of labor, before he will issue a certificate as hereinbefore provided for; . . ."

The foregoing is a portion of § 7664. It appears further along in the section that, if the factory or mill does the work ordered within thirty days and pays the commissioner ten dollars, it shall be entitled to have the certificate, which is declared by the section to be *prima facie* evidence of conformity with the act, issued to it forthwith. It would seem, therefore, that the inspectors' reports are in the nature of original entries or findings upon which the certificate is based.

The inspectors' reports constituting Exhibit 41-A have a well defined official status. The bureau of labor

was required by chapter 74, Laws of 1901, p. 132, to cause to be enforced

". . . all laws established for the protection of the health, lives and limbs of operators in work-shops, factories, mills, and mines, . . ." (Rem. Rev. Stat., § 7587 [P. C. § 3435].)

It was made the duty of operators of factories and mills to make such reports and furnish such data as the bureau might require. (§ 7588 [P. C. § 3436].) The commissioner of labor, or any employee of the bureau of labor, was given power to enter

". . . any factory, mill . . . to examine into the methods of protection from danger to employees and the sanitary conditions in and around such buildings and places and make a record thereof, . . ." (§ 7590 [P. C. § 3438].)

Reports and returns made to the bureau and records or documents gathered or returned by the commissioner or inspectors are, by § 7591 [P. C. § 3439], expressly "declared public documents," not to be destroyed without the permission of the governor. The factory act, passed in 1905, made it the express duty of the commissioner of labor, by himself or deputy, to annually examine factories and mills to determine whether they conform to the act.

The administrative code adopted in 1921 abolished the bureau of labor and the commissioner of labor, and provided:

"The director of labor and industries shall have the power, and it shall be his duty . . .

"(2) To exercise all the powers and perform all the duties in relation to the inspection of factories, mills, . . . and the machinery and apparatus therein contained, . . . and in relation to the administration and enforcement of all laws providing for the protection of employees in mills, factories, work-shops, and other places where machinery is used, and in relation to the enforcement, inspection, and certification of safe

places and safety device standards in all industries, now vested in, and required to be performed by, the commissioner of labor; . . .

"(7) To exercise all the powers and perform all the duties now vested in, and required to be performed by, the bureau of labor; . . ." (Rem. Rev. Stat. § 10838 [P. C. § 4-80].)

'The three inspectors' reports constituting Exhibit 41-A are undoubtedly certified copies of public documents required by law to be kept on file in the office of a department of the state, and were properly admitted under Rem. Rev. Stat., § 1257 [P. C. § 7776], unless barred by the hearsay rule.

█ Hearsay evidence is excluded by the courts principally because it is not sanctioned by the oath of the person who made the offered statement and no opportunity is afforded for cross-examination. To this rule, there are many exceptions. One of these is that public documents or "official written statements," as the text writers prefer to call them, are admissible even though the party who made the statements therein contained is not produced in court. The rule is partially founded upon expediency, but principally upon the presumption that the officer will do his duty. This is taken as a sufficient guarantee of trustworthiness. 3 Wigmore on Evidence (2d ed.), § 1631. Jones' Commentaries on Evidence (2d ed.), § 1700. It is said by Professor Wigmore (§ 1635) that it is clear that no express statute or regulation is required to create the duty to make the statement. "The existence of the duty, and not the source of its creation, is the sanctioning circumstance." Regarding this duty, the author also says, in subd. 8 of § 1633:

"But it does not follow that only the person taking the oath of office, or only the person expressly vested by statute or otherwise with the duty, is competent to make the statement. Not only does practical necessity

require that the details of duty be delegated; but, furthermore, such a delegation re-creates the duty with equal efficacy sufficient to satisfy the requirements of principle. The instances in which the statement may be made by a person other than the one specifically charged with the duty seems to be of two classes.

"(a) The first and commonest is that of *deputy*,—as a clerk, registrar, surveyor, or the like. The duty—in the sense of the direct responsibility—of making the record or other statement is upon the general officer or head of department. But the authority to delegate a part of his work to subordinates is in effect a parcelling out of his duty, and the duty exists again for them in fractional form to the extent that the work has been thus assigned. Whether the duty of the subordinates may be thought to run directly to the immediate chief or else to the Government is not material. The fact is that they are not mere intruders or unauthorized substitutes, but possess lawfully the delegated duty; and the determining inquiry must be whether the general nature of the office authorized a delegation of the details of work."

This must be the principle upon which weather reports are admitted. *Anderson v. Hilker*, 38 Wash. 632, 80 Pac. 848; *Peterson v. Arland*, 79 Wash. 679, 141 Pac. 63. The annual rain fall at a given locality, for example, must be made up, at least in part, from the reports of subordinates. Similar considerations must have influenced the supreme court of the United States in *Chesapeake & Delaware Canal Co. v. United States*, 250 U. S. 123, 39 S. Ct. 407, 63 L. ed. 889. In this case, the admission of printed compilations of treasury accounts made by different clerks, and in part not even based upon original entries, was approved, the court saying, in part:

"Thus, their character as public records required by law to be kept, the official character of their contents entered under the sanction of public duty, the obvious necessity for regular contemporaneous entries in them and the reduction to a minimum of motive on the part

of public officials and employees to either make false entries or to omit proper ones, all unite to make these books admissible as unusually trustworthy sources of evidence."

It is impossible to cite and discuss the many cases cited in the briefs concerning the reception or denial of hospital records, log books, death certificates, assessors' reports, marriage licenses, census tables, tide tables, weather reports, tax collectors' books, coroners' reports, and so on. No case has been cited, and probably none can be found, exactly like the case at bar. The most that can be done is to arrive at the principles governing the matter and apply them to the question presented.

It appears that the trial court was largely influenced in granting the motion for a new trial by the fact that this court held in *Sullivan v. Seattle Electric Co.,* 51 Wash. 71, 97 Pac. 1109, 130 Am. St. 1082, that the report of a coroner could not be admitted to prove the cause of death when offered by the plaintiff in a damage suit. After referring to the holding in that case, the trial judge said in his memorandum opinion, "I do not consider the report of a state inspector to be on a higher plane than that of a coroner."

The rule excluding coroners' reports in actions brought on insurance policies and in actions to recover for wrongful death is practically universal and, as the *Sullivan* case points out, is founded on public policy. The opinion quotes extensively from the authorities and, among others, from *Germania Life Ins. Co. v. Ross-Lewin,* 24 Colo. 43, 51 Pac. 488, 65 Am. St. 215, as follows:

"In case of death under suspicious circumstances, or resulting from accident, the rule permitting inquisitions to be used in evidence would result in a race and scramble to secure a favorable coroner's verdict that would influence, and, perhaps control . . ."

The court in the *Sullivan* case also stressed the fact that the report actually offered was merely a statement required by law to be furnished by the coroner to the auditor for statistical purposes. It was not required to be filed and retained as a public document.

The inspectors' reports comprising Exhibit 41-A appear to be admissible in accordance with most, if not all, the tests laid down with respect to the admissibility of official written statements. As we have seen, the director of the department, being charged with the duty of enforcing the factory act, is required by law to make annual inspections personally or by deputy. Reports returned by the inspectors are declared by statute to be public records, and they cannot be destroyed without the governor's permission. Thus, to paraphrase the words of the supreme court in *Chesapeake & Delaware Canal Co. v. United States, supra,* their character as public records required by law to be kept, the official character of their contents entered under the sanction of public duty, and the reduction to a minimum of motive on the part of the inspectors to either make false entries or to omit proper ones, all unite to make the report admissible as unusually trustworthy sources of evidence.

It may be added that they are the original documents on which the department would have relied in issuing the certificate made *prima facie* evidence of compliance with the factory act by § 7664. Nothing more remained to be done after each inspection was made to entitle the appellant to the certificate of compliance other than to do the work provided in the report and pay the department the sum of ten dollars and receive a receipt. The issuance of the certificate is a mere ministerial act. The statute says:

"Upon presentation of said receipt to said commissioner of labor, or his deputy, he shall forthwith issue

said certificate as in this chapter provided . . ."
(§ 7664.)

The problem may perhaps be more readily solved by another method of approach. Would it have been error to have refused to admit defendant's Exhibit 41-A? The appellant was charged with failure to warn Grant that he was exposed to dangerous and noxious gases and with failure to comply with the ventilation requirements of the factory act. To these allegations, it had pleaded a general denial. A department of the state was charged with the duty of enforcing compliance with the factory act. To that end, it was made its duty to annually inspect the appellant's mill and, having inspected it, to serve the appellant with a written statement pointing out in which respect the mill and its machinery and appliances fell short of compliance with the act.

The department had done all these things in 1928, 1929 and 1930. The records of its inspections, required by law to be returned and filed in the department as public documents, were on file there and showed that no changes were required during these years with respect to the bleaching machinery or with respect to the ventilation of the rooms in which the bleaching operation was carried on. Copies of these records, duly certified under Rem. Rev. Stat., § 1257, were offered by appellant as evidence.

These inspectors' reports tended to prove that the appellant did not know of any danger against which to warn Grant and were also some evidence that the mill was complying with the factory act during that period, for they require nothing to be done with reference to the bleaching machinery or ventilation. In this respect, they are not offered to prove the truth of anything other than the fact that the inspections were actually made by the department and that the defi-

ciencies pointed out by its inspectors in no way related to defects in bleaching machinery or to ventilation. As evidence of these facts, the reports speak for themselves, and they are not hearsay, but original evidence. It would have been error to have excluded the inspectors' reports constituting copies of defendant's Exhibit 41-A, since they were properly certified public documents on file in one of the departments of the state and directly tended to sustain the denials of defendant's answer.

During the controversy preceding the admission of the reports, the appellant's attorney stated that he did not contend that they were conclusive evidence of anything, but only that they were *some* evidence of his client's compliance with the act, and that he was willing to have the exhibit limited by any instruction which the respondent's attorneys might propose and the court might care to give. If the trial court felt that the expressions "ventilation good" and "ventilation o. k.," appearing on the face of the reports, were likely to unduly prejudice the jury, it was its duty to avoid that danger by giving appropriate instructions.

In a recent Minnesota case, *Trainor v. Buchanan Coal Co.*, 154 Minn. 204, 191 N. W. 431, involving the question as to whether the defendant was justified in stopping shipments because of impaired credit, the defendant offered at the trial a report of the Bradstreet Company reciting that "the business record of the concern is not good as they have failed to meet most of its obligations promptly and fairly," and other statements of like character. The report was excluded. On appeal, the supreme court held such exclusion error and, among other things, said:

"The court thought there was danger that the jury would take the report as evidence of the facts reported. That danger could be largely avoided by careful instruction from the court."

■ In the case at bar, the trial court admitted Exhibit 41-A and then, following the plan suggested by counsel and approved in the Minnesota case just cited, gave two long cautionary instructions (Nos. 11-a and 11-b) as to the effect to be given the exhibit by the jury. The sufficiency of these instructions cannot be questioned by respondent and could not have been questioned on the hearing of her motion for a new trial, for they were given to the jury in the exact language requested by respondent without change or alteration. A litigant cannot except to instructions which he himself proposed. *Emerson v. Santa Clara County,* 40 Cal. 543; *Dawson v. Williams,* 37 Neb. 1, 51 N. W. 284; *Dunn & Lallande Bros. v. Gunn,* 149 Ala. 583, 42 So. 686.

Having arrived at the conclusion that defendant's Exhibit 41-A was properly admitted, it is unnecessary to express any opinion as to the other question so extensively argued by the parties; that is, whether or not the trial court should have directed a verdict for the defendant because of the insufficiency of the evidence to support any other.

The order appealed from is reversed, and the trial court is directed to enter judgment in accordance with the verdict.

STEINERT, C. J., HOLCOMB, BEALS, and TOLMAN, JJ., concur.